UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JOSEPH LEWIS,<br><br>               Plaintiff,<br><br>    v.<br><br>DELTA AIR LINES, INC.,<br><br>               Defendant. | Case No. 2:14-cv-01683-RFB-GWF<br><br>**OPINION & ORDER**<br><br>Plaintiff's Motion for Summary Judgment (Dkt. No. 67) and Defendant's Motion for Summary Judgment (Dkt. No. 68) |

**I.   INTRODUCTION**

`Before the Court is a Motion for Summary Judgment (Dkt. No. 67) filed by Plaintiff Joseph Lewis, and a Motion for Summary Judgment (Dkt. No. 68) filed by Defendant. Since both motions address the same claims, the Court will analyze both motions jointly. For the reasons discussed below, Defendant's Motion for Summary Judgment (Dkt. No. 68) is GRANTED in part, and DENIED in part. Plaintiff's Motion for Summary Judgment (Dkt. No. 67) is DENIED.

**II.   BACKGROUND**

Plaintiff Joseph Lewis filed a Complaint against Delta Airlines on October 14, 2014. He brought three claims against Delta: a claim for Failure to Accommodate, under the Americans with Disabilities Act ("ADA"); a claim for Wrongful Termination on the Basis of Disability, under the ADA; and a claim for Unlawful Discriminatory Employment Practices, under N.R.S. 613.31, the Nevada Equal Employment Opportunity Act. On February 8, 2016, both Plaintiff and Defendant filed their cross Motions for Summary Judgment (Dkt. No. 67, 68). Responses were filed on March 18, 2016 (Dkt. No. 84, 85). Replies were filed on April 4, 2016 (Dkt. No. 86, 87).

### A. Undisputed and Disputed Facts

The Court incorporates its discussion of the undisputed and disputed facts from its hearing on Tuesday, September 6, 2016. The Court discusses and elaborates these facts here.

#### 1. *Undisputed Facts*

Joseph Lewis started working for Delta Airlines as an Aircraft Maintenance Technician in 2000. He transferred to Las Vegas in 2008. Glenn Carter was his supervisor at that time. On October 4, 2010, Carter issued Lewis a Warning Letter relating to his attendance, including no call/no shows on October 1 and 2, 2010. Carter also issued a memo to Lewis, stating: "On several occasions during the past few months it appears that there have been discrepancies between your sign in sheet arrival time and actual arrival time at the airport."

On May 6, 2011, Lewis was forty-five minutes late to work, and stated that it was because he was pulled over by the police. On June 5, 2011, Lewis was two hours late to work, and stated that it was because he left his identification in his girlfriend's car. On June 8, 2011, Lewis was twenty five minutes late to work, and stated that it was because he could not find his cell phone. On June 13, 2011, Carter issued Lewis a Probation Warning Letter relating to his attendance, placing him on probation for a minimum of six months. On a 2011 evaluation, Lewis' "Reliability/Attendance" was deemed "Unacceptable".

In October 2011, Kirk Kozy became Lewis' supervisor. Kozy was informed by Carter that Lewis had attendance and reliability issues. On November 22, 2011, Kozy communicated with Lisa Todd in Human Resources, noting that Lewis had been sick three times in the first month of Kozy's supervision. Kozy recommended termination, because Lewis was already on probation for reliability. Lewis was not terminated at that time. Lewis was advised that his probation for attendance and reliability issues would be extended another six months.

On February 17, 2012, Kozy recommended that Todd place Lewis on Final Warning, due to further attendance issues. On February 10, Lewis requested to leave 2 hours early, and on February 11th, he called in sick. On February 12th, he worked for three hours, but then asked to be released for the remaining five hours of the shift. Lewis presented Kozy with a note about viral gastroenteritis symptoms from his doctor. Lewis never presented Kozy with a note about HIV or

any other illness diagnosis. On February 22, 2012, Lewis was given a Final Warning Letter. Kozy recommended that Lewis explore short term disability, along with the email of his Final Warning. Shortly thereafter, Lewis went on FMLA leave. He took his allotted 12 weeks of FMLA time, and remained out on short-term disability through July 4, 2012. On May 5, 2012, while on the leave, Lewis was diagnosed with HIV.

Lewis was released to return to work on July 5, 2012, with no restrictions, per a doctor's note. Lewis' medications allowed him to return to work and perform his job satisfactorily on a normal basis, though he would still sometimes get sick. In August 2012, Lewis' shift started at 2 p.m., by which time he was supposed to be in the maintenance office. Lewis would typically drive to work and park in the employee parking garage, where he would have to swipe his badge to gain access. Once he left the garage, Lewis had two main ways to get to his work area, and would swipe through a series of doors either way to get there.

Lewis was late to work on August 10, 2012, because he forgot his badge, and he informed Kozy over the phone that he would be late for that reason. On August 11, as soon as Lewis arrived at the airport, he went into a public bathroom and was there past 2 p.m. Lewis got to the work area at about 2:30 p.m., but then spent his time in the work area bathroom until he left with permission at 4 p.m. Lewis was out sick on August 12. For both August 10 and 11, Lewis put his arrival time on the Daily Attendance Record as 2 p.m. On August 10, he put his departure time as 10 p.m., and on August 11, the departure time was listed as 4 p.m., with six hours of sick time for the remainder of the shit.

On August 14, Lewis called the HR specialist, Todd, and told her that he had HIV. He also discussed prescription refill issues he had recently had with his medication, which was the reason for his symptoms on August 11 and 12. He asked for an accommodation for the absences on August 11 and 12. He told Todd that he didn't want any of his coworkers to know about his condition. At this point, Lewis represented that he had already resumed his medication. Todd wrote in her notes of the call that the discussion about medication pertained to a historical event that had been resolved by the time of the telephone call. Regarding the two absences, Todd referred Lewis to Sedgwick, Delta's leave management company, about obtaining a possible continuation of his

leave. Lewis called Sedgwick several times between August 14 and 24, informing them that he wanted August 10 and 11 covered as part of his FMLA leave. Sedgwick recommended no referral for accommodation because Lewis did not face permanent restrictions. Lewis was never referred to a "return-to-work specialist" in Delta's Equal Opportunity department. Delta only employs these specialists for individuals returning from leave.

On August 20, Todd had a conversation with Kozy, during which Kozy stated he wanted to hold Lewis accountable for his most recent absences. Todd reached out to Joanne Guerrant, the Equal Opportunity Manager. In August 20 emails to Guerrant, Todd stated that Kozy "continues to see the same pattern that has always existed with Joe's attendance, and would like to progress him if appropriate," and also noted that there was an issue with Lewis putting the scheduled arrival time on his timesheet when his actual arrival time was later. This discrepancy pattern in his Daily Activity Report had previously been a problem noted by his old supervisor Carter, in a memo to Lewis in 2010. Todd and Guerrant communicated and Guerrant informed Todd that there was some risk in terminating Lewis and that she had to be careful. Todd describes the risk as "that the individual had HIV, and so we did not hold him accountable for the [absences]. What we addressed was the other concerns we had. That was his honesty."

On August 23, Lewis had a conference call with Kozy and Todd. Subsequent to this call, he prepared a written statement. In the statement, Lewis explains that on August 10, he was in the office by 2:07 p.m. He also states that on that day, "I did stay and make up more than the seven minutes after my shift." He also explains that his regular practice was to sign in at his normal assigned in and out times, stating, "I generally understood this to be a luxury of having a sign in sheet, instead of documenting exact minute of arrival/departure. I have generally never claimed any overtime until an hour over my shift had elapsed, and then estimate by the additional half hour." Lewis then explains his August 11 illness-related absence as being due to his lack of medication for his condition for which he previously obtained FMLA leave. He does not identify his illness in this written statement.

Kozy obtained badge swipe records, showing that Lewis did not arrive in the maintenance office on August 11 until after 2:19 p.m. On that same date, his badge swipe records show that

1 Lewis swiped his badge to leave slightly before 9:57 p.m., and left the parking area before 10:03
2 p.m., contrary to his written statement that he worked past 10 p.m. on that day. Todd's investigative
3 summary on August 27 stated that "these absences [August 11 and 12] are felt to be connected to
4 his medical leave of absence ending on 7/6/12 and are not being considered in the assessment for
5 termination." The report also stated that Joe Lewis "is being evaluated for termination for ongoing
6 concerns related to attendance and reliability."

7 At a meeting on August 29, Lewis was suspended pending investigation for potential
8 termination. Kozy recommended to Todd that Lewis be terminated, and Todd recommended to her
9 superiors in HR that Lewis be terminated. She received approval from HR to terminate Lewis. All
10 terminations have to also be approved by Delta's Equal Opportunity department. The reason for
11 termination given on the department's paperwork was "Falsification of Payroll Records." On
12 September 14, Todd advised Kozy: "The review of recommendation for termination of
13 employment for [Lewis] has been completed. It has been determined that the employee should be
14 asked to resign specifically because he recorded and was paid for time that he did not actually
15 work and for failure to be forthcoming during the investigation. If the employee refuses to resign,
16 their employment should be terminated." Lewis refused to resign, and was subsequently
17 terminated.

18 ### *2. Disputed Facts*

19 The parties dispute whether Kozy knew about Lewis' HIV status. Lewis alleges that he
20 informed Kozy in the early stages of his HIV diagnosis while out on leave that HIV was a possible
21 explanation for his persistently recurring illness and that Kozy's response to this possibility was
22 shock and silence. Lewis also alleges that after his August 2012 absences, on or about August 14,
23 2012, he attempted to approach Kozy to discuss his illness, and that Kozy avoided the
24 conversation. Delta disputes these allegations and maintains that Kozy did not know about Lewis'
25 disability.

26 The parties also dispute whether Lewis' August 11 and 12, 2012 absences were a factor in
27 his termination. Defendant argues that Lewis was terminated for falsifying his Daily Attendance
28 Record. Plaintiff argues that this reason is pretextual, and that his falsification of attendance

records was inextricably linked to his absences based on his disability, and thereby that Lewis was terminated because of his HIV.

Finally, the parties dispute whether Delta had a *de facto* policy of permitting employees to sign in as having completed their exact assigned time of entry and departure, if they were less than one pay increment (half an hour) late, and that Lewis was not the only one marking incorrect timings on his sign-in sheets.

### III.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

### IV.   ANALYSIS

**A. ADA Claim 1 – Wrongful Termination on the Basis of Disability**

To establish a prima facie case of discrimination under the ADA, a Plaintiff must show that she: (1) is a disabled person within the meaning of the statute; (2) is a qualified individual with a disability; and (3) suffered an adverse employment action because of her disability. 42 U.S.C. 12112. The Supreme Court has held that HIV is a disability under the ADA. Bragdon v. Abbott, 524 U.S. 624, 637 (1998).

The dispute in this case centers around whether Lewis suffered termination because of his disability. The ADA does not require that a discriminatory impetus have been the only motive for an adverse employment action. See Clark v. Curry County, 451 F.3d 1078, 1084-85. "The ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation – a motivating factor standard." Head v. Glacier Northwest, Inc., 413 F.3d 1053, 1065 (9th Cir. 2005). There is "a distinction between termination of employment because of misconduct and termination of employment because of a disability." Collins v. Longview Fibre Co., 63 F.3d 828, 832 (9th Cir. 1995). However, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." Humphrey v. Mem'l Hosps. Ass'n., 239 F.3d 1128, 1139-40 (9th Cir. 2001). On August 11 and 12 of 2012, Lewis experienced HIV-related symptoms due to his lack of access to medication, and these symptoms made him unable to work on those dates. Therefore, if Lewis was terminated as a consequence of the symptoms of his illness, and his resultant absence, experienced on August 11 and 12, then this would constitute impermissible discrimination under the ADA.

Defendant argues, and Lewis' official termination documents state, that he was terminated because of falsification of payroll records and ongoing concerns regarding "attendance and reliability." It is undisputed that Lewis did not report his time of entry and departure accurately on August 10 and August 11 of 2012. It is also undisputed that in 2010, prior to Lewis' FMLA leave related to his HIV, Lewis was warned of discrepancies between his sign in sheet arrival time and actual arrival time at the airport. The falsification of time of entry and departure on a payroll sheet would not constitute conduct resulting from HIV, and Plaintiff has not argued that it would. Therefore, if this were the only motivation for Lewis' termination, this legitimate, non-discriminatory reason would suffice. However, Plaintiff argues that Defendant's alleged legitimate, non-discriminatory reason is pretext, and in the alternative, that even if it was a factor in his termination, his absences on August 11 and 12 were also factors. Plaintiff argues this by virtue of the fact that the entire termination process was triggered by Kozy informing Todd that he wanted to hold Lewis accountable for the August 10 and 11 absences.

Plaintiff also points to emails on August 21 in which Todd suggests that Kozy cautiously ask him about leaving early due to illness and calling in the next day. Kozy replied that he wanted to ask something about those two days but didn't know how to do it without "digging too deep". Todd ultimately directed Kozy that the questions around Lewis' absences should be limited. Todd has stated that her reason for limiting the questions was because the absences were related to Lewis' disability and his FMLA leave, and it was part of her job in HR to consult with Delta's legal and equal opportunity departments to avoid violating the ADA, and to advise Todd, who did not know of Lewis' disability, as to how to proceed. Plaintiff further points to the fact that repeated investigative summaries and official statements explicitly stated that the absences were not being considered in the assessment for termination.

Plaintiff further argues that circumstantial evidence of pretext is shown by the fact that Defendant did not follow the appropriate investigations policy when Lewis raised a concern that other employees are allowed to leave work early and are not being held accountable for absences. It is unclear, and Plaintiff does not point to, when in the record he raised any concern of disparate treatment to anyone at Delta, and Lewis admits he is not bringing a disparate treatment claim. Delta denies that checking in on time if slightly late was a usual practice in the maintenance groups and was commonly allowed for employers and supervisors alike. Lewis has asserted circumstantial evidence of a *de facto* policy of allowing tardy employees to sign in on time, based on his attorneys' review of 6000 work days for 35 employees and supervisors who worked for Delta at McCarran Airport. They found that on only three occasions was a start time adjusted forward and a pay exception used to cover a tardy arrival in the sign in sheets. Lewis has also asserted that based on his review of badge swipes of six of Lewis' coworkers, there were five instances of tardy arrivals with corresponding on time sign ins among four employees, who were not similarly disciplined. Delta denies these allegations.

Based on the above factual disputes regarding Delta's policy of allowing on time sign ins even when employees were somewhat late, and regarding whether Lewis' disability-related absences were in any way motivating Delta's decision to terminate him, the Court finds that summary judgment is inappropriate on this claim. There are factual disputes relevant to whether

Delta's alleged reason for termination was pretextual, and whether Lewis was fired, in part, because of his disability. The Court therefore denies summary judgment on Lewis' wrongful termination claim under the ADA.

### B. ADA Claim 2 – Failure to Accommodate

The ADA prohibits an employer from discriminating against "an individual with a disability" who with "reasonable accommodation" can perform a job's essential functions, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. 12112(a) and (b). "The plaintiff remains free to present evidence of special circumstances that make 'reasonable' a…rule exception in the particular case. And such a showing will defeat the employer's demand for summary judgment." U.S. Airways Inc. v. Barnett, 535 U.S. 391 (2002) (dealing with an employee's request for an exemption from a "seniority system" based on disability). When a reasonable accommodation of a disability is requested, the employer is required to engage in the so-called interactive process to determine if the accommodation is possible. "[T]his obligation is triggered by an employee…giving notice of the employee's disability and the desire for accommodation." Id.

Plaintiff's Complaint argues that he was denied accommodations on the following grounds: (1) expediting of his medicine; (2) using the bathroom, without being subjected to interrogation, when he needed to vomit, and (3) that his personnel file wouldn't suffer discipline-provoking inaccuracies due to his disability. At the hearing on the instant motions, Plaintiff conceded that he does not have a colorable accommodation claim regarding delay of his medicine, or not being allowed to use the bathroom without being subjected to interrogation. Therefore, the Court dismisses those portions of the claim, and focuses its analysis on the primary subject of briefing in this case: Plaintiff's request for an accommodation as to his August 11 and 12 absences, to link them to his FMLA leave such that his record would not suffer adverse consequences.

When Plaintiff made his accommodation request to Todd, she referred him to Sedgwick, Delta's leave management company. Ultimately, Sedgwick decided it could not designate August 11 or 12 as FMLA leave because Lewis had used up his allotment of FMLA for the year. Sedgwick also determined it could not connect these days to his prior short-term disability leave because

- 9 -

more than 30 days had elapsed since Lewis had returned to work, per Delta policy. Lewis argues that sending him to Sedgwick was not a reasonable accommodation in response to his request. He argues that he should have been connected to Delta's Equal Opportunity Department. Lewis has provided no discussion of why, even if he was not connected to an EO representative, Todd's response to his request was a failure to engage in an interactive process to accommodate him, under the law. Delta argues that, although Lewis' two absences were not connected to his FMLA, since they were explicitly not counted against him in his termination process, Lewis was effectively accommodated.

The Court finds that the same disputed issues of material fact that preclude summary judgment on Plaintiff's discrimination claim – whether his August 11 and 12 absences factored into his termination – are material to his accommodation claim regarding those absences. It incorporates by reference the earlier discussion of those disputed issues, supra, as to Plaintiff's discrimination claim. Therefore, the Court denies summary judgment as to Lewis' accommodation claim regarding his personnel file being adversely implicated by the absences. The Court grants Defendant's motion for summary judgment with respect to any accommodation claims regarding expediting of medicine or use of the bathroom.

**C. Nevada Equal Employment Opportunity Act Claims**

Nevada looks to the federal courts for guidance in discrimination cases applying its anti-discrimination statute, N.R.S. 613.33. Pope v. Motel 6, 121 Nev. 307, 311 (Nev. 2005) ("In light of the similarity between Title VII of the 1964 Civil Rights Act and Nevada's anti-discrimination statutes, we have previously looked to the federal courts for guidance in discrimination cases.") Therefore, the Court's analysis of Lewis' N.R.S. claims mirrors its analysis of his ADA claims, and the court incorporates by reference those discussions, supra.  As genuine issues of disputed fact remain regarding this claim, as noted, summary judgment is also denied with respect to this claim.

/ / /

/ / /

/ / /

**D. Plaintiff's Motion for Summary Judgment**

As the Court has determined, <u>supra</u>, disputed issues of material fact remain as to Plaintiff's wrongful termination claim, and as to Plaintiff's accommodation claims with respect to his two absences. Therefore, Plaintiff's Motion for Summary Judgment is likewise denied on those claims.

**V.     CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's accommodation claims with respect to his delay in medication, and his use of the bathroom, under the ADA and N.R.S. 613.33. (Dkt. No. 68).

**IT IS FURTHER ORDERED** that summary judgment is **DENIED** as to Plaintiff's accommodation claims with respect to his two absences, under the ADA and N.R.S. 613.33. (Dkt No. 67).

**IT IS FURTHER ORDERED** that summary judgment is **DENIED** as to Plaintiff's wrongful termination claims. (Dkt. No. 67).

**DATED**: <u>September 22, 2016</u>.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**